**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CRIMINAL ACTION NO. 3:14-CR-00102-TBR**

UNITED STATES OF AMERICA,                                          Plaintiff,

v.

EDISON ARTICA ALFARO, *et al.*,                                Defendants.

**MEMORANDUM OPINION AND ORDER**

On September 23, 2014, Edison A. Alfaro and Marco A. Chaires allegedly tried to purchase seven kilograms of cocaine from two persons thought to be connected to a Mexican drug cartel. However, the suppliers worked—not for the cartel—but for the United States Drug Enforcement Administration. Law-enforcement officers promptly arrested and indicted Alfaro and Chaires for conspiring and attempting to possess at least five kilograms of cocaine with intent to distribute the same. Alfaro and Chaires move to dismiss the indictment against them on grounds of entrapment. Viewing the record in the light most favorable to the Government, however, the Court cannot say that the Government entrapped them as a matter of law. Consequently, Alfaro and Chaires' motion to dismiss is **DENIED**.

**I.**

**A.**

In July 2014, the United States Drug Enforcement Administration, in cooperation with the Louisville Metro Police Department, utilized two confidential sources to pose as cocaine suppliers as part of an investigation into a criminal drug trafficking organization. R. 1 at 2, ¶ 3 (Criminal Complaint). LMPD officers directed the two confidential sources to areas in Louisville, Kentucky associated with bulk narcotics trafficking. *Id.* While

1

visiting one such location, the confidential sources met Marco A. Chaires. *Id.* The confidential sources established themselves as persons connected to a Mexican drug cartel capable of providing multiple kilograms of cocaine. *Id.*, ¶ 4. "Based on this information," Chaires explained that his associate, Edison A. Alfaro, was actively involved "in the distribution of cocaine . . . and would be interested in such an opportunity." *Id.* Chaires introduced the confidential sources to Alfaro that same day, and Alfaro "confirmed his interest in purchasing cocaine" from them. *Id.* Chaires provided his telephone number to the confidential sources and said "that they could contact that telephone number in regards to setting up a future cocaine transaction." *Id.*

In the weeks following, the confidential sources exchanged multiple telephone calls with Chaires, eventually scheduling a meeting "for the purpose of negotiating a cocaine transaction." *Id.*, ¶ 5. On August 26, 2014, Chaires and Alfaro met with the confidential sources at Hooters. *Id.*, ¶ 6. During the meeting, Alfaro told the confidential sources that he had been receiving fifteen kilograms of cocaine twice a month from a different source at a price of $33,000 per kilogram. R. 104 at 10, ¶ 6 (DEA Report of Investigation). However, Alfaro wanted to find a new supplier, preferably one capable of providing "a purer product . . . directly from Mexico." *Id.* at 10–11. He wished to purchase between ten and fifteen kilograms of cocaine from the confidential sources, with the possibility of purchasing more in the future. *Id.* at 11, ¶ 7. Alfaro, Chaires, and the confidential sources agreed on a price of $34,000 per kilogram, contingent on the quality of the cocaine supplied. *Id.*, ¶ 8. Because he had purchased $350,000 of marijuana earlier that day, though, Alfaro told the confidential sources that he would need a few days' notice in order to "recoup [his] investments" before completing the

2

transaction. *Id.*, ¶ 7. The group agreed "to finalize the location and other details of the transaction at a later date with the expectation that [the confidential sources] could provide the cocaine in the following weeks." R. 1 at 3, ¶ 6.

Throughout September, the confidential sources exchanged multiple telephone calls with Chaires and then arranged a meeting on September 23 at Senor Iguanas to discuss the transaction further. *Id.*, ¶ 7. Following that meeting, the confidential sources drove Alfaro and Chaires to a nearby location where law-enforcement officers had previously placed ten kilograms of cocaine (and a substance disguised to look like cocaine) in a horse trailer. *Id.* Alfaro and Chaires inspected the ten one-kilogram packages. *Id.* "Following that inspection and additional negotiations," the pair agreed to purchase five kilograms of cocaine for $170,000. *Id.* Alfaro and Chaires told the confidential sources that the exchange would happen later that same day, and the confidential sources returned Alfaro and Chaires to their vehicles at Senor Iguanas. *Id.*, ¶ 9.

Later that afternoon, Chaires informed the confidential sources that he and Alfaro wished to increase the amount of cocaine purchased to seven kilograms for $238,000. *Id.* at 4, ¶ 10. The confidential sources accepted Chaires counteroffer. *Id.* Around 6:50 p.m., Alfaro and Chaires met the confidential sources in the parking lot of Kroger. *Id.*, ¶ 12. One of the confidential sources entered Alfaro and Chaires' vehicle, where he was handed "a large black bag" containing $238,000. *Id.* Law-enforcement officers then arrested Alfaro and Chaires. *Id.*

3

**B.**

On October 7, 2014, Edison A. Alfaro and Marco A. Chaires were indicted for conspiring and attempting to possess at least five kilograms of cocaine with intent to distribute the same. R. 16 at 1–2 (Indictment). Since that time, Alfaro and Chaires have engaged in substantial motion practice related to discovery and other issues. *See United States v. Alfaro*, No. 3:14-CR-00102-TBR, 2015 WL 173797 (W.D. Ky. Jan. 13, 2015); *United States v. Alfaro*, No. 3:14-CR-00102-TBR, 2015 WL 1042115 (W.D. Ky. Mar. 10, 2015). Presently, Alfaro moves to dismiss the indictment against him on grounds of entrapment, R. 94 (Motion to Dismiss), and asks for an evidentiary hearing on that motion, R. 105 (Motion for Evidentiary Hearing). Chaires wishes to adopt Alfaro's outstanding motions as his own. R. 106 (Motion to Adopt Co-Defendant's Motions).[1]

**II.**

Courts recognize the affirmative defense of entrapment "to prevent the conviction of the 'unwary innocent' induced by government action to commit a crime. It does not, however, protect the 'unwary criminal.'" *United States v. Skarie*, 971 F.2d 317, 320 (6th Cir. 1992) (quoting *United States v. Russell*, 411 U.S. 423, 429 (1973)). A valid entrapment defense requires proof "of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in criminal

---

[1] Alfaro also filed papers *pro se* seeking—as far as the Court can discern—a writ of mandamus directing his attorney to serve the Government with various discovery requests. *See* R. 97 at 1–3 & n.1 (Petition for Writ of Mandamus). Alfaro has a Sixth Amendment right to appear either *pro se* or by counsel—but not both. *See* 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel . . . ."); *United States v. Flowers*, 428 F. App'x 526, 530 (6th Cir. 2011) ("Although a criminal defendant has a constitutionally protected right to present his own defense in addition to a constitutionally protected right to be represented by counsel, he has no right to hybrid representation." (citing *United States v. Cromer*, 389 F.3d 662, 680 (6th Cir. 2004); 28 U.S.C. § 1654)); *cf. United States v. Williams*, 641 F.3d 758, 770 (6th Cir. 2011) ("Because Williams was represented by counsel on this appeal, we decline to address [his] pro se arguments." (citing *United States v. Martinez*, 588 F.3d 301, 328 (6th Cir. 2009))). Consequently, the Court strikes Alfaro's *pro se* filing as improper, and directs Alfaro that all papers must be filed by his attorney of record.

activity." *United States v. Al-Cholan*, 610 F.3d 945, 950 (6th Cir. 2010) (quoting *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002)) (internal quotation marks omitted). Alfaro and Chaires must come forward with sufficient evidence in support of both elements before the burden shifts to the Government to prove predisposition. *See United States v. Poulsen*, 655 F.3d 492, 502 & n.2 (6th Cir. 2011); *United States v. Meyer*, 803 F.2d 246, 249 (6th Cir. 1986).

The Sixth Circuit Court of Appeals has not articulated "an extensive definition of inducement," *Poulsen*, 655 F.3d at 502 n.3, but has said it must be "something more than 'merely afford[ing] an opportunity or facilities for the commission of the crime,'" *id.* at 502 (alteration in original) (quoting *Matthews v. United States*, 485 U.S. 58, 66 (1988)). While related to inducement, predisposition refers to "the defendant's state of mind before his initial exposure to government agents." *United States v. Kussmaul*, 987 F.2d 345, 348 (6th Cir. 1993) (quoting *United States v. Johnson*, 855 F.2d 299, 303 (6th Cir. 1988)) (internal quotation marks omitted). Factors relevant in determining the defendant's state of mind include:

> (1) the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of the criminal activity was initially made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and (5) the nature of the inducement or persuasion supplied by the Government.

*Al-Cholan*, 610 F.3d at 950; *see also United States v. Bost*, 536 F. App'x 626, 631 (6th Cir. 2013). The Court may find entrapment as a matter of law where the "undisputed evidence," taken in the light most favorable to the Government, demonstrates "a 'patently clear' absence of predisposition." *United States v. Schaffer*, 586 F.3d 414, 426 (6th Cir. 2009) (quoting *United States v. Harris*, 9 F.3d 493, 498 (6th Cir. 1993)) (internal

5

quotation marks omitted). "It is seldom appropriate," however, "to grant a pre-trial motion to dismiss based on an entrapment defense." *Id.* (citing *United States v. Fadel*, 844 F.2d 1425, 1431 (10th Cir. 1988)).

### III.

Alfaro and Chaires argue the indictment against them must be dismissed because the Government entrapped them as a matter of law. *See* R. 94 at 4–6. Yet, Alfaro and Chaires identify no evidence of Government inducement. Moreover, while Alfaro and Chaires argue that the Government cannot show either was predisposed to commit the charged offense, those arguments are either based on disputed evidence or are without merit. Consequently, the Court cannot say that the Government entrapped them as a matter of law.

### A.

It is well-settled that there is no improper inducement where the Government merely affords a person the opportunity to commit a crime. *Sorrells v. United States*, 287 U.S. 435, 441 (1932); *United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994) (Breyer, C.J.) ("An 'inducement' consists of an 'opportunity' *plus* something else . . . ."). On the present record, it appears the Government did nothing more than that. That is, the confidential sources merely afforded Chaires, and later Alfaro, the opportunity to purchase multiple kilograms of cocaine. *See* R. 1 at 2, ¶ 4. Alfaro and Chaires readily acted on that opportunity. *See id.* at 2–4, ¶¶ 4–12. There is no evidence that the Government applied "excessive pressure" on either Alfaro or Chaires, or took "advantage of an alternative, non-criminal type of motive." *Gendron*, 18 F.3d at 961; *see also Meyer*, 803 F.2d at 249 (describing inducement as "the presence of government pressure"

to commit the crime charged). Viewing the record in the light most favorable to the Government, then, there is no evidence of improper inducement. *Cf. United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990) ("Simply stated, the government agents did not entrap Nelson by merely presenting him the opportunity to sell the cocaine that he possessed.").

**B.**

Even if Alfaro and Chaires had demonstrated improper inducement, the evidence neither is undisputed, nor does it show a patently clear absence of predisposition. *First*, while Alfaro and Chaires claim no involvement "with drug use, sales, manufacture, [or] distribution," R. 94 at 4, the Government says that both were "engaged in the distribution of cocaine" prior to any contact with the confidential sources. R. 104 at 9, ¶ 2. Because the Court cannot "choose between conflicting testimony or make credibility determinations," resolution of that issue must be left for trial. *Schaffer*, 586 F.3d at 426.

*Second*, it seems that the Government suggested the criminal activity, although that point is not entirely clear. *See* R. 1 at 2, ¶ 4. However, the fact that a Government agent "proposed an illicit transaction or attempted to arrange the purchase of narcotics is insufficient to establish entrapment," at least without something more. *United States v. Barger*, 931 F.2d 359, 367 (6th Cir. 1991) (citing *United States v. Andrews*, 765 F.2d 1491, 1499 (11th Cir. 1985); *United States v. Henciar*, 568 F.2d 489, 491 (6th Cir. 1977); *United States v. Hairrell*, 521 F.2d 1264, 1267 (6th Cir. 1975)). Ultimately, in light of other circumstances, this one factor is of little consequence.

*Third*, Alfaro and Chaires pursued the criminal acts alleged for profit. Alfaro discussed his need to "recoup investments he had in other drugs." R. 104 at 11, ¶ 7.

Alfaro described how he had been purchasing fifteen kilograms of cocaine (priced at $33,000 per kilogram) twice a month from a different supplier. *Id.* at 10, ¶ 6. Because of issues with the quality of that cocaine, Alfaro sought a new supplier who could provide "a purer product . . . directly from Mexico." *Id.* at 10–11. Drawing all reasonable inferences in the Government's favor, Alfaro's statements, along with the quantity of drugs involved, strongly suggest a profit-motive. *Cf. United States v. Hernandez*, 31 F.3d 354, 360 (6th Cir. 1994) ("Nunez knew how to set up deals of four kilos and twenty kilos of cocaine. These are not the actions of an innocent dupe having no predisposition to commit the crimes charged.").

*Fourth*, Alfaro and Chaires exhibited little to no reluctance in carrying out the criminal offense. For example, when the confidential sources first met Chaires, he immediately expressed interest in purchasing cocaine in bulk, gave the confidential sources his telephone number, and introduced them to Alfaro that same day. R. 1 at 2, ¶ 4. Throughout August and September 2014, the confidential sources exchanged multiple telephone calls with Chaires. *Id.* at 2–3, ¶¶ 5–7. Alfaro and Chaires met with the confidential sources twice, inspected the cocaine packages, and actively negotiated the quantity and other details of the transaction before arriving with a black bag containing $238,000. *Id.* at 2–4, ¶¶ 4–12. While Alfaro says he attempted to terminate the transaction at the eleventh hour, that fact is disputed. *Compare* R. 94 at 3, 5, *with* R. 1 at 4, ¶ 12. Regardless, Alfaro and Chaires' actions hardly demonstrate reluctance overborne only by the Government's insistence. Viewing the record in the light most favorable to the Government, Alfaro and Chaires have not shown a patently clear absence of predisposition.

8

## C.

Alfaro and Chaires also ask the Court to hold an evidentiary hearing on their entrapment defense. R. 105 at 1–3. However, as the Court explained above, much of the evidence related to the issue of entrapment is disputed. Where that is the case, "the question is one of fact for the jury," and the Court cannot "substitute its factual findings for those that the jury might make." *United States v. Killough*, 607 F. Supp. 1009, 1011 (E.D. Ark. 1985); *accord United States v. Schafer*, 625 F.3d 629, 636 (9th Cir. 2010) (affirming denial of evidentiary hearing in light of factual questions); *United States v. Ashanti*, No. 2:10-CR-20310-SHM-CGC, 2011 WL 1466448, at *3 (W.D. Tenn. Mar. 28, 2011), *adopted by* No. 10-20310, 2011 WL 1466445 (W.D. Tenn. Apr. 18, 2011). In addition, the entrapment defense is so central to the general issues in this case that holding a hearing solely on it would be tantamount to conducting two trials. *See Killough*, 607 F. Supp. at 1011; *see also Schaffer*, 586 F.3d at 426. Accordingly, the Court finds that the Alfaro and Chaires' entrapment defense is properly resolved at trial, not at a pretrial evidentiary hearing.

## IV.

**IT IS HEREBY ORDERED** that Defendant Edison A. Alfaro's *Pro Se* Motion to Dismiss for Entrapment (R. 92) and Defendant Edison A. Alfaro's Motion to Dismiss for Entrapment (R. 94) are **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Edison A. Alfaro's *Pro Se* Motion for Writ of Mandamus (R. 97) is **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Edison A. Alfaro's *Pro Se* Motion for Evidentiary Hearing (R. 104) and Defendant Edison A. Alfaro's Motion for Evidentiary Hearing (R. 105) are **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Marco Anton Chaires' Motion to Adopt Co-Defendant's Motions (R. 106) is **GRANTED**; and,

**IT IS FURTHER ORDERED** that a Telephonic Further Proceedings for both Defendants is set for **February 18, 2016 at 10:00 a.m. EST**. The Court will place the call.

**IT IS SO ORDERED.**

Date:

cc:     Counsel of Record